**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------X

APOLLO GLOBAL MANAGEMENT, INC.,
APOLLO MANAGEMENT, L.P.,
APOLLO ADVISORS VIII, L.P., and
APOLLO ADVISORS IX, L.P.,

      Plaintiffs,

      - against -

STEPHEN CERNICH, and
HUAN TSENG,

      Defendants.

--------------------------------------------------------X

**COMPLAINT**

Case No.

**INTRODUCTION**

1.      Plaintiff Apollo[1] brings this action against defendants Stephen Cernich and Huan Tseng ("Defendants") for substantially assisting and actively concealing the fraud and misconduct perpetrated upon Apollo by two former Apollo employees, Imran Siddiqui and Ming Dang.  As a JAMS Arbitrator recently found, Siddiqui and Dang breached their fiduciary duties of loyalty to Apollo and engaged in "reprehensible" and fraudulent behavior by working surreptitiously to subvert Apollo's interests in favor of the interests of a competing business that they worked with several others to secretly form and pursue.  The JAMS Arbitrator specifically found that Dang "lacked a moral compass" and that he engaged in "clearly deliberate" fraudulent activity while working with Cernich and Tseng.  This action seeks to hold Cernich and Tseng accountable for

---

[1]      "Apollo" refers collectively to Plaintiffs Apollo Global Management, Inc., formerly known as Apollo Global Management, LLC ("AGM"), Apollo Management, L.P. ("Apollo Management"), Apollo Advisors VIII, L.P. ("Apollo Advisors VIII"), and Apollo Advisors IX, L.P. ("Apollo Advisors IX").

their deliberate and substantial role in assisting and concealing Siddiqui's and Dang's adjudicated misconduct.

2.      Cernich and Tseng knew that Dang and Siddiqui each owed fiduciary duties of loyalty and contractual duties to Apollo and were breaching those duties in numerous ways, including by collecting and transmitting Apollo's Confidential Information for the benefit of Caldera, soliciting investors to invest in Caldera rather than Apollo, and competing against Apollo for acquisition targets.  Cernich and Tseng substantially assisted Dang and Siddiqui in their misconduct, including by taking numerous measures to conceal their involvement.  With respect to Dang, for example, Cernich (i) scrubbed the metadata and removed Dang's electronic trace from documents that Dang worked on before sending those documents to third parties; (ii) initially communicated with Dang about their new business venture by sending emails to Dang's fiancée's email account, rather than to Dang's own email account; (iii) bcc'd Dang on external emails or forwarded the emails to Dang after they were sent, to hide Dang's involvement on the email chains; (iv) enabled Dang to listen to conference calls surreptitiously by conferencing Dang into the calls from his cell phone rather than forwarding him meeting invites, to avoid alerting the call organizer that Dang was on the line or had been forwarded the meeting invite; and (v) knew about and knowingly benefited from Dang's practice of regularly logging into Siddiqui's personal email account and sending emails to Caldera's advisors as though he were Siddiqui.  Tseng similarly engaged in many of these same activities to help conceal Dang's involvement after Tseng joined Caldera in fall 2017.

3.      Cernich also took numerous actions to conceal Siddiqui's involvement in Caldera while Siddiqui was an Apollo employee, including removing Siddiqui's electronic trace from documents that were sent to third parties, keeping Siddiqui off of email chains with potential

investors (and instead forwarding the emails to Siddiqui after they were sent), and intentionally omitting mention of Siddiqui while communicating with certain third parties about Caldera.  In addition, Cernich substantially assisted Siddiqui in taking actions to advance Caldera's interests at the expense of Apollo's while Siddiqui remained an Apollo partner and employee; and both Tseng and Cernich assisted Dang to do the same, including by requesting and utilizing Dang's assistance with preparing Caldera materials to solicit investors and pursue acquisition targets in direct competition with Dang's employer, Apollo.

## RELEVANT BACKGROUND

4.     At the beginning of 2016, Siddiqui was a senior Apollo partner.  He also was a member of the Board of Directors of Athene Holding, Ltd. ("Athene").  Individuals associated with Apollo had formed Athene in 2009 as an alternative investment vehicle for participating Apollo clients, and Apollo has a strategic relationship with Athene.[2]

5.     On March 9, 2017, Siddiqui gave notice of his resignation from Apollo and Athene, with his resignation from Apollo effective June 18, 2017.  After his resignation became effective, Siddiqui was bound by post-employment restrictive covenants, including a twelve-month non-competition and non-solicitation restriction, and an ongoing prohibition against using or disclosing Apollo's Confidential Information (as defined in Siddiqui's agreements with Apollo).

6.     On September 14, 2017, an article in *Bloomberg News* reported that Siddiqui and Cernich, a former Athene executive, were "seeking more than $1 billion from investors for a

---

[2]     In furtherance of Apollo's strategic relationship with Athene, Apollo has (i) invested in, and managed clients' investments in, Athene; (ii) helped Athene raise other funding from Apollo clients; (iii) provided strategic advisory services to help Athene grow its business organically and through financings and acquisitions; (iv) had its employees serve as directors on Athene's Board; and (v) provided discretionary management and other advisory services for Athene's investment portfolio.  In addition, Athene has invested in Apollo-managed funds and financial products; and Athene Asset Management, L.P., an indirect Apollo subsidiary, and other Apollo affiliates manage and advise on Athene's portfolio and invest (or advise on the investment of) Athene's assets in a variety of types of investments.

venture to pursue deals in the life insurance industry."  Apollo asked Siddiqui for information about his new venture in order to determine if he was violating his post-employment restrictive covenants.  Siddiqui did not supply Apollo with sufficient information to alleviate its concerns.

7.      Consequently, Apollo filed an arbitration against Siddiqui in JAMS on January 9, 2018 (the "First Arbitration"), pursuant to the arbitration clauses in Siddiqui's contractual agreements with Apollo.  Apollo alleged that Siddiqui was violating his post-employment restrictive covenants and had violated his fiduciary duties to Apollo.  Apollo also named Siddiqui's new business as a Respondent in the First Arbitration (which Apollo referred to as "XYZ Company"), but Siddiqui and his counsel claimed in a letter to JAMS that the new business did not exist and therefore could not be served in the action.

8.      Apollo and Siddiqui settled the First Arbitration on February 21, 2018, before any discovery occurred.  The parties executed an agreement (the "Settlement Agreement") to memorialize their settlement.

9.      In the Settlement Agreement, Siddiqui agreed to forfeit a significant portion of his interest in Apollo investment funds, worth approximately $15 million at the time.  Siddiqui also agreed that he would not use or disclose Apollo's Confidential Information moving forward nor solicit any current Apollo employee other than his personal assistant.  Siddiqui further agreed to return or destroy all Apollo property (including all Confidential Information) in his possession, and to execute an attestation verifying his compliance with this requirement.  Apollo agreed to release Siddiqui and his new company for all then-existing claims relating to the First Arbitration or restrictive covenants, and to waive Siddiqui's non-competition and non-solicitation of investor provisions (subject to discrete exceptions not applicable here).

10.     After settling the First Arbitration, Apollo learned that Siddiqui's new business in fact existed (contrary to his and his counsel's prior representations to JAMS) and was named Caldera, and that Caldera was attempting to acquire a company that had been a long-time acquisition target of Apollo and Athene.  Apollo believed that it would be impossible for Siddiqui to make this effort so soon after his departure from Apollo without using Apollo's Confidential Information.  Apollo requested information from Siddiqui regarding its concerns, but Siddiqui refused to provide any.  As a result, Apollo filed a second arbitration against Siddiqui in JAMS on May 3, 2018, for breach of the Settlement Agreement (the "Second Arbitration").

11.     During Apollo's internal review of documents in the Second Arbitration, Apollo discovered emails that inadvertently were sent to Siddiqui's Apollo email address while he was still an Apollo employee.  The emails revealed that, even before Siddiqui left Apollo, he was surreptitiously working with an Apollo colleague, Dang, along with Cernich and one other individual, to form and operate a new business that was secretly competing with Apollo.  On October 25, 2018, Apollo asked Dang about these emails.  Dang denied any wrongdoing but then resigned from Apollo the following day, with his resignation effective immediately.

12.     On November 28, 2018, Apollo sued Dang in JAMS pursuant to the arbitration clauses in Dang's contractual agreements with Apollo.  Apollo asserted numerous claims against Dang, including for fraud, breach of fiduciary duty, breach of contract, and aiding and abetting Siddiqui's breach of fiduciary duty.  Apollo also asserted claims against Siddiqui and his new company, Caldera, for aiding and abetting Dang's breach of fiduciary duty and tortiously interfering with Dang's contract with Apollo.  These claims were consolidated upon all parties' consent into the Second Arbitration (the "Consolidated Arbitration").

13.     In February and March 2019, the parties participated in a seven-day arbitration hearing (the "Arbitration Hearing").  The JAMS Arbitrator heard live testimony from 15 witnesses, and the final hearing transcript totaled approximately 1,800 pages.  More than 580 documents were admitted into evidence.  The parties submitted voluminous post-hearing briefing totaling over 500 pages collectively.

14.     On April 29, 2019, the JAMS Arbitrator issued his reasoned decision in the Consolidated Arbitration in the form of a Final Arbitration Award (the "Award," attached hereto as Ex. 1).  The Award found that Siddiqui and Dang each violated their fiduciary duties of loyalty to Apollo by operating their secret business, Caldera, while they were still Apollo employees; by clandestinely competing against Apollo for investors and acquisition opportunities; and by secretly transmitting Apollo's Confidential Information outside of Apollo for the benefit of Caldera.

15.     The JAMS Arbitrator condemned Siddiqui's and Dang's conduct in stark terms in his Award, finding that:

    a.  Siddiqui and Dang engaged in conduct that "violated both the letter and the spirit of the [Apollo] Code of Ethics."  (Award at 8.)

    b.  Dang's testimony at the hearing "reflected a lack of a moral compass."  (Award at 7.)

    c.  Siddiqui and Dang engaged in intentional misconduct by transmitting confidential Apollo materials to their personal email accounts and to Caldera, and by taking "many active steps" to hide their involvement in Caldera.  (Award at 8.)

    d.  Siddiqui and Dang actively worked on behalf of Caldera to acquire a target company, Fidelity & Guaranty Life ("FGL"), at a time when Siddiqui was tasked

with acquiring that same company for Apollo, demonstrating "how both Siddiqui and Dang were working at cross-purposes with their employer."  (Award at 8.)

e.   Siddiqui's and Dang's conduct with respect to Caldera violated their contractual agreements with Apollo not to operate a competing business.  (Award at 9, 15.)

f.   Siddiqui continued to solicit and secretly work with Dang after the Settlement Agreement, and Dang's continued involvement was "impossible to justify." (Award at 10.)

g.   Siddiqui breached the Settlement Agreement in three distinct ways:  by (i) failing to return or destroy Apollo's Confidential Information, (ii) submitting a false affidavit stating he had done so, and (iii) continuing to solicit Dang to work for Caldera.  (Award at 12-13.)

h.   Siddiqui's breach of the Settlement Agreement "could not be any clearer" and "there is no legitimate excuse for this blatant failure" to ensure that his sworn affidavit was truthful.  (Award at 12.)

i.   Siddiqui breached his fiduciary duty of loyalty to Apollo while he was an Apollo employee based on the evidence that he "collected and transmitted Apollo's and Athene's Confidential Information, that he solicited investors in an attempt to persuade them to invest in Caldera rather than Apollo or Athene, that he competed with Apollo and Athene for acquisition targets, and that he remained on Athene Board of Directors for the purpose of protecting his own personal interests." (Award at 14.)

j.   Dang substantially assisted Siddiqui's breach of his fiduciary duty of loyalty "by providing considerable assistance to Siddiqui in drafting models and decks for

Caldera.  He helped conceal Siddiqui's involvement by modifying documents.  He prepared documents used to solicit investors, and he was involved actively in Caldera's attempts to acquire a company that Athene also was seeking to acquire."  (Award at 14.)

k.  Dang breached his own fiduciary duty of loyalty to Apollo "in a number of respects for the period from July 27, 2016 though his October 26, 2018 resignation" through actions that "were both comprehensive and taken in ways that were adverse to Apollo."  (Award at 14-15.)

l.  Dang breached his contractual obligations to Apollo in numerous ways, including because "he was not allowed to participate in certain competitive business including an 'alternative asset manager.'  Dang's active involvement with Caldera breached that portion of the agreement."  (Award at 15.)

m.  Dang committed a fraud upon Apollo because he "made misrepresentations to Apollo during the course of his employment.  He made repeated and false certifications of his compliance with Apollo Code of Ethics.  He also certified falsely that he had not engaged in any outside business activities.  His extensive and time-consuming work for Caldera makes clear that his representations were false.  This conduct was clearly deliberate.  Given that Dang did not reveal the true facts, Apollo continued to employ him under false pretenses."  (Award at 16.)

16.  The JAMS Arbitrator issued injunctive relief as to Siddiqui, Dang, and Caldera, requiring them to appoint a forensic examiner, at their expense, to oversee the destruction and/or return of Apollo's Confidential Information in their possession, and to "perform to the extent necessary removal of any electronically-stored information."  (Award at 18.)  Siddiqui and Caldera were "directed to submit an attestation to Apollo that details that both that there has been complete

8

compliance with this portion of the Order and describes the steps that have been taken to insure compliance with it."  (Award at 18.)

17.    The JAMS Arbitrator ordered Dang to forfeit a portion of the compensation that he received from Apollo during the period that he was a faithless servant, totaling $1,000,000, as a result of his "reprehensible" conduct.  The JAMS Arbitrator found that Siddiqui and Caldera were jointly and severally liable for $75,000.  The JAMS Arbitrator permitted Apollo to impose a forfeiture upon all of Dang's Points in his Apollo limited partnerships, and required Dang to return all legal fees that had been advanced to him by Apollo.  The JAMS Arbitrator also assessed punitive damages against Siddiqui in the amount of $150,000.  (Award at 20.)

18.    On May 6, 2019, Apollo filed a petition asking the Supreme Court of New York, New York County, to confirm the Award.  Siddiqui, Dang, and Caldera joined Apollo's petition. The Court granted the petition on July 16, 2019.

19.    In sum, the JAMS Arbitrator's Award conclusively determined that Siddiqui and Dang breached their fiduciary duties to Apollo and engaged in an ongoing pattern of fraudulent and improper conduct.  The instant action seeks redress as to Cernich and Tseng, who intentionally and substantially assisted and concealed Siddiqui's and Dang's misconduct in numerous ways over an extended time period, as set forth in detail below.

## THE PARTIES

20.    Plaintiff AGM is a Delaware corporation with its principal place of business in New York, New York.

21.    Plaintiff Apollo Management is a Delaware limited partnership with its principal place of business in New York, New York.

22.     Plaintiff Apollo Advisors VIII is a Delaware limited partnership with its principal place of business in New York, New York.

23.     Plaintiff Apollo Advisors IX is a Delaware limited partnership with its principal place of business in New York, New York.

24.     Defendant Cernich held various senior executive positions at Athene from 2009 until his resignation from Athene in June 2016, including Executive Vice President of Corporate Development and Chief Actuary.  Upon information and belief, Cernich is a resident of Kentucky.

25.     Defendant Tseng worked for Athene from October 2015 to September 2017 as a Vice President of Reinsurance.  Upon information and belief, Tseng is a resident of Canada.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000 (exclusive of interest and costs).

27.     This Court has personal jurisdiction over Defendants because they have substantial contacts with New York, and because each Defendant committed acts in person in the state of New York for the purpose of carrying out the wrongful conduct described herein and the injuries occurred in New York.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted herein occurred in this judicial district.

## FACTUAL ALLEGATIONS

29.     As set forth in detail below, Cernich worked extensively to substantially assist and conceal Siddiqui's and Dang's misconduct as Apollo employees (and Tseng later did the same with respect to Dang after joining Caldera in fall 2017).  Among other ways:

- Cernich worked closely with Siddiqui and Dang to pursue the acquisition of a target company for Caldera that he knew Siddiqui's and Dang's employer, Apollo, was actively competing to acquire for Athene.

- Cernich knowingly received and benefited from Siddiqui's and Dang's siphoning of Confidential Information from Apollo to assist Caldera.

- Cernich worked closely with Siddiqui and Dang to develop investor decks and presentations to solicit investors who Cernich knew were current Apollo and/or Athene investors, in an effort to obtain their investment capital for Caldera instead.

- Cernich collaborated with Siddiqui and Dang to try to make Apollo and Athene overpay for acquisition targets in order to weaken the financial condition of Apollo and Athene and thereby weaken their ability to compete vigorously against Caldera for future acquisition targets.

- Cernich regularly and intentionally concealed Siddiqui's and Dang's involvement in Caldera in a wide variety of ways, as explained in detail below.

**A.      Cernich Worked Extensively with Siddiqui and Dang on Their Competing Business in Fall 2016**

30.     In fall 2016, Cernich worked extensively with Siddiqui and Dang on the new business they were developing to compete against Apollo and Athene.  Cernich understood that Siddiqui (an Apollo partner and Athene Board member) and Dang (an Apollo principal) each owed a fiduciary duty of loyalty to Apollo.  Cernich also recognized, however, the importance of

11

Siddiqui's and Dang's involvement in their new business,[3] admitting during the Arbitration Hearing that he understood how important it was for the new company that Siddiqui be involved at the outset. Cernich also testified at the Arbitration Hearing that he wanted to keep Siddiqui's and Dang's involvement in Caldera a secret. Cernich explained that the specific reason he wanted to keep Dang's involvement a secret was to enable Dang to continue to receive his regular paycheck from Apollo while acting against Apollo's interests. Accordingly, Cernich took numerous actions to actively conceal Siddiqui's and Dang's involvement from Apollo, while facilitating and benefiting from their assistance.

31.     As an example of Cernich's facilitation of Dang's and Siddiqui's deception, despite Siddiqui's and Dang's extensive involvement in Caldera in fall 2016, Cernich did not include them on his communications with potential business partners and investors at that time. Cernich intentionally omitted Siddiqui and Dang from emails with these outside individuals and investment firms, instead typically forwarding the correspondence to Siddiqui and Dang immediately after the external emails were sent, to keep Siddiqui and Dang up-to-date about Caldera's activities while concealing their involvement.

32.     In addition, Cernich requested and received from Siddiqui confidential Apollo and Athene information stolen from Apollo's databases and servers. Siddiqui used his access as an Apollo partner to obtain these materials from Apollo's system and then used his personal email account to transmit them to Cernich in order to assist him in developing Caldera. The illicitly transmitted Confidential Information included Apollo's and Athene's confidential strategic plans, analyses of potential acquisition targets, risk assessments, and detailed evaluations of specific insurance and reinsurance products. Cernich never told Siddiqui to stop sending this information

---

[3]     This new business was referred to as "Newco" initially, but later named and incorporated it as Caldera Holdings Ltd. ("Caldera").

during this time, but instead, knowingly accepted the improperly transmitted information. Siddiqui illicitly transmitted Confidential Information to Cernich on numerous occasions.

33.     Cernich also participated in a ruse in fall 2016 to hide Dang's communications about Caldera. When communicating with Dang at that time, Cernich sent messages to the email address of Dang's fiancée, Agnes Shin. Dang had his own personal email account that he could have used, but, upon information and belief, Cernich chose to send Dang emails through his fiancée's email address instead so that Dang would not be exposed if these emails were ever discovered. Cernich discussed with Dang in these emails the Caldera business plan, including projections of its growth, and solicited Dang's assistance with developing it.

34.     This is just one example of part of a larger effort by Cernich to conceal Siddiqui's and Dang's involvement in Caldera in 2016 and onward.

35.     On November 7, 2016, despite his involvement with Caldera, Siddiqui submitted a certification to Apollo that he had received and read Apollo's Code of Ethics, that he understood it, and that he had and would continue to comply with it. Among other things, Apollo's Code of Ethics required its employees to refrain from participating in unauthorized outside business activities and disclosing Apollo's information. Notably, after his submission in November 2016, Siddiqui did not submit another certification, nor did he inform Apollo of his work on Caldera, as required by the Code of Ethics. As a result, Apollo continued to hold the belief that Siddiqui was complying with the Code of Ethics. Dang, too, made the same certifications on October 31, 2016, and November 8, 2017. Accordingly, as recognized by the JAMS Arbitrator, Dang defrauded Apollo into believing that he was acting loyally to Apollo and was not involved in outside business activities.

36.     Cernich spent most, if not all, of his career in the insurance industry, which is heavily regulated. As a highly experienced executive in a heavily regulated industry, he would have known that Dang and Siddiqui were required to submit certifications about their business activities to Apollo.  In addition, Cernich, as a former executive of Athene who worked very closely with Apollo, was aware of the annual certifications that Apollo employees, including Siddiqui and Dang, were required to sign.  Upon information and belief, Cernich knew that Siddiqui and Dang were not in compliance with Apollo's Code of Ethics, which requires Apollo employees to disclose any outside business activities, and that Siddiqui and Dang did not inform Apollo of their role in Caldera, based on the fact that Siddiqui and Dang themselves took repeated steps to hide their involvement in Caldera from Apollo.

37.     Cernich substantially assisted Siddiqui and Dang in perpetrating this fraud upon Apollo at this time.  For example, in November 2016, Cernich was having conversations with investors about their potentially investing in Caldera, and Siddiqui and Dang each provided feedback to Cernich about what to tell those investors to obtain their funding for Caldera.  In working to obtain funding for Caldera, an Apollo competitor, Siddiqui and Dang both were acting adverse to Apollo, substantially and intentionally assisted by Cernich.

38.     In addition, Cernich created a financial model in fall 2016 that was designed to solicit investment capital by showing potential Caldera investors how Caldera intended to deliver a return on their investment.  In November 2016, Cernich gave the model to Dang and asked him to assist with it.  Under Cernich's direction and guidance, Dang worked extensively on building out the model, including updating pricing assumptions and building outputs into the model based on directions that Cernich provided to him.  Cernich worked hand-in-hand with Dang on the model

during this time, reviewing and commenting on his work, and directing him to make changes to the model.

39.    On November 28, 2016, Siddiqui sent Cernich a draft cover note and the latest version of Dang's model for Cernich to send to a potential Caldera investor.  Cernich sent this email and forwarded Dang's model to the investor but did not copy Siddiqui or Dang on his email, so that the investor would not detect Siddiqui's or Dang's involvement and potentially report to Apollo that they were involved.

40.    On December 10, 2016, Siddiqui sent Cernich a term sheet that Cernich could use for a meeting with a potential Caldera investor.  Siddiqui asked Cernich to first PDF the document before circulating it so that the metadata in the document would not reflect Siddiqui's involvement in creating it.  As Siddiqui informed Cernich, Siddiqui was not willing to participate directly in any conversations with this investor until he received a major payment from Apollo that he was expecting to receive in January 2017.  Cernich understood that Siddiqui wanted to continue to hide his involvement in Caldera to ensure that Apollo remained unaware of his misconduct, thereby protecting this significant payment to him in or around January 2017.  Cernich abided by Siddiqui's request, thereby ensuring that Apollo did not learn from its investors or others in the marketplace that Siddiqui was working to subvert Apollo's interests.  Cernich continued to actively conceal Siddiqui's involvement in fall 2016 and early 2017, enabling Siddiqui to achieve his goal of being paid as expected by Apollo in 2017.

41.    On December 14, 2016, Siddiqui, Dang, Cernich, and another individual met in person in New York City to get Caldera organized for future activities.  Siddiqui conceded at the Arbitration Hearing that he "probably should have" resigned from Athene's Board before

attending this Caldera meeting with Cernich and others, but he did not do so because he wanted to receive a payout from Apollo in January 2017.

42.     On December 27, 2016, Dang emailed Cernich, Siddiqui, and another individual involved with Caldera an updated version of the Caldera financial model that he was developing with Cernich to share with potential Caldera investors.  Cernich knew that the model was being developed to solicit investment capital for their new business, including from Apollo's current investors, to the detriment of Dang's employer, Apollo.

**B.     Cernich Assisted Siddiqui's and Dang's Misconduct in 2017**

   1) Cernich Continued to Assist Siddiqui and Dang with Subverting Apollo's Interests in 2017

43.     In 2017, Cernich continued to help Siddiqui and Dang work "at cross-purposes with their employer."  (Award at 8.)  For example, on January 8, 2017, Dang sent Cernich and Siddiqui an updated version of the Caldera model, which Dang prepared based on information that Cernich provided to him.  Dang informed Cernich that the model was ready to be sent to investors because Dang had removed all links to Dang and Siddiqui from the document's metadata and changed the document to make it look less Apollo-like.  Understanding that Dang had taken steps to hide his and Siddiqui's involvement, Cernich sent the "scrubbed" model to investors after these changes were made.  He did so to avoid exposing Siddiqui's and Dang's betrayal of their employer.

44.     On January 9, 2017, Siddiqui used his personal email address to send Cernich and Dang confidential internal files showing Apollo's and Athene's retail pricing assumptions for November 2016, December 2016, and January 2017.  Cernich understood that these decks contained Apollo's confidential and proprietary information and that Siddiqui was breaching his duty of loyalty to Apollo by transmitting them.  He also knew that Dang owed fiduciary duties to

Apollo, and that Dang nevertheless was using these Apollo and Athene pricing materials to update the Caldera model.

45.     On January 23, 2017, in connection with his work for Caldera, Cernich corresponded with a lawyer in Bermuda about setting up a meeting with the Bermuda Monetary Authority.  Cernich omitted Siddiqui from his email chain with Bermuda counsel and thereby concealed his involvement, instead forwarding the email chain to Siddiqui immediately afterward. Upon information and belief, Cernich did not want the Bermuda Monetary Authority to know that Siddiqui was actively working to establish a competing business in Bermuda while he remained an Apollo partner.

46.     In February 2017, Caldera was working to acquire FGL, a public company up for auction.  To make a viable bid, the Caldera team recognized that it would need investors.  Cernich solicited Siddiqui's and Dang's assistance for, among other purposes, developing materials to solicit investors, with a particular emphasis on Apollo's investors, to support Caldera's bid on FGL.  Cernich also requested Siddiqui's and Dang's assistance with preparing communications directly to FGL.

47.     While Cernich was working with Siddiqui and Dang on pursuing the FGL opportunity for Caldera, he knew that Apollo and Athene also were pursuing FGL and making a competing bid.

48.     In fact, Siddiqui was the Apollo partner tasked with spearheading Apollo's and Athene's bid on FGL at this time, making his simultaneous and secretive work on Caldera's competing bid a particularly egregious breach of his fiduciary duty of loyalty.  Upon information and belief, Cernich understood that Siddiqui's role at Apollo would require him to participate in

17

Apollo's own bid effort and have access to Apollo's FGL-related materials, and still Cernich assisted Siddiqui with working on Caldera's bid and concealing Siddiqui's involvement in it.

49.     On February 7, 2017, Dang emailed Cernch with comments on Caldera's draft bid letter for FGL.  Cernich told Dang that he had heard that Apollo/Athene were also interested in the FGL opportunity, and even so, Cernich requested and utilized Dang's assistance in drafting the Caldera bid letter for FGL.

50.     On March 2, 2017, Siddiqui received his expected payment from Apollo, ultimately worth over $30 million in net profit.  Siddiqui only received this payment because Apollo did not know of Siddiqui's misconduct at the time, which Cernich helped to conceal.

51.     On or about March 9, 2017, Siddiqui gave notice of his intent to resign from Apollo, effective June 2017.  Siddiqui remained bound by a fiduciary duty of loyalty to Apollo and was still an Apollo employee until his resignation took effect.

52.     During this time, Cernich continued to work with Siddiqui on Caldera-related matters.  For example, on March 17, 2017, Cernich met Siddiqui in the Middle East for a meeting with a potential Caldera investor whom they were soliciting to support Caldera's bid on FGL.  An email with Cernich's overseas itinerary for this trip, and a comment about the need for him and another individual who joined him to keep Siddiqui's reasons for traveling secret, was inadvertently forwarded to Siddiqui's Apollo email address, rather than to Siddiqui's personal email address.

53.     On March 22, 2017, Dang circulated to Cernich and Siddiqui a deck that he prepared to enable them to solicit a specific Apollo investor to invest in Caldera in connection with Caldera's effort to acquire FGL.  One page of the deck compared a potential investment by that investor in Caldera versus Athene.  Cernich then used this deck to pursue that investor.

54.     On March 23, 2017, Siddiqui provided the password to his personal Gmail account to Dang, so that Dang could freely access Siddiqui's Gmail account and correspond with Caldera's professional advisors as though he were Siddiqui.  Cernich knew that this was Dang's practice and actively benefited from Dang acting in his "Imran persona."

55.     Cernich continued to use Dang to advance the interests of Caldera even though he understood the risk of Dang's employer uncovering Dang's duplicity.  In this regard, Cernich continued his regular practice of not copying Dang on emails sent outside the Caldera team in spring 2017, so that Dang's involvement in Caldera would remain concealed.

56.     On April 2, 2017, Siddiqui sent Cernich and Dang an email noting that, if Caldera lost the FGL bid, Athene would probably win it, but Caldera would benefit because Athene would need to pay a high price for the company and utilize its excess capital.  This commentary is yet another example of Cernich having actual knowledge that Siddiqui and Dang were working directly against the interests of Apollo and Athene while both continued to receive paychecks from Apollo.

57.     In May 2017, a potential Caldera investor emailed Cernich and asked about the structure of the Caldera team, referencing the three Caldera "founders" whom he knew about (Cernich, Siddiqui, and another individual other than Dang).  That other person circulated comments internally to Siddiqui, Cernich, and Dang and noted that there was a fourth founder, in reference to Dang.  In response, Dang stated that he was "not sure we need to introduce a fourth founder at this point."  Dang made this suggestion because he wanted to continue to hide his involvement.  Cernich went along with Dang's suggestion, in order to continue to keep Dang's identity hidden from this investor.

58.     Around this time, Siddiqui officially left Apollo and began corresponding more openly with outside parties about Caldera, even though he remained bound by post-employment restrictive covenants.  Dang, meanwhile, remained at Apollo, and continued to work secretly on Caldera matters.  Cernich understood the need to keep Dang's involvement hidden from outsiders and continued to assist Dang with concealing his involvement in Caldera from Apollo and others.  Siddiqui also reminded Cernich that it was important to continue to conceal Dang's involvement in Caldera.  Siddiqui expressly told Cernich that, if Dang's involvement in Caldera made its way back to Apollo, then Dang would be fired, and Siddiqui and Cernich would be sued.

59.     Cernich also sent Siddiqui and Dang a draft business plan for Caldera to provide to the Bermuda Monetary Authority.  Siddiqui was listed in a prior draft as Caldera's CEO and Interim CIO, but Cernich crossed this out.  Dang's name also did not appear anywhere in the document.  Cernich was attempting to hide the fact that Siddiqui and Dang were involved in Caldera.

2)  Tseng Joins Caldera in or Around October 2017 and Contributes to Actively Concealing Dang's Involvement

60.     In fall 2017, Tseng, a former senior actuary at Athene, joined the Caldera team.  Almost instantly, he began to conceal Dang's involvement too, which enabled Dang to continue violating his fiduciary duty of loyalty and perpetrating his fraud upon Apollo, in the ways discussed below.

C.  **Cernich and Tseng Continue to Assist Dang's Misconduct after the Settlement Agreement in 2018**

61.     The Settlement Agreement to resolve the First Arbitration was executed on February 21, 2018.  As the JAMS Arbitrator found in his Award, it was "impossible to justify" Dang's ongoing involvement in Caldera after that date.

62.     Cernich and Tseng substantially assisted and actively concealed Dang's work on Caldera following the Settlement Agreement.  Cernich and Tseng  (i) reviewed documents at Dang's request and ensured that Dang's name did not appear anywhere in the documents, including in the metadata, before the documents were forwarded externally; (ii) continued to dial Dang into conference calls rather than send him meeting invites directly in order to hide his involvement from the meeting organizers; (iii) communicated with Dang at times through Siddiqui's Gmail address instead of Dang's own email address; (iv) bcc'd Dang on emails with Caldera's investors and financial advisors or forwarded the emails to Dang after they were sent, to avoid exposing Dang's involvement with Caldera; (v) misled investors into believing that they (Cernich and Tseng) created work product, when in fact Dang was the architect, to keep Dang's involvement secret; and (vi) regularly solicited Dang's assistance with drafting presentations, building financial models, commenting on draft letters and term sheets, and producing other output for the Caldera team to pursue investor and acquisition opportunities in direct competition with Dang's employer, Apollo.

63.     On March 12, 2018, Tseng reminded the Caldera team that a draft term sheet should not be forwarded externally until Dang's comments were removed in order to erase Dang's "fingerprints" from it.  In other words, sending it in its current state would risk revealing Dang's involvement in Caldera while he remained an Apollo employee.

64.     Cernich, Siddiqui, and Tseng worked closely with Dang to pursue a long-time Apollo acquisition target (defined herein as "Company A" for confidentiality reasons) for Caldera in spring 2018, even though they knew that Dang's employer, Apollo, was working with Athene to make a competing bid on Company A.  For example:

a. The Caldera team continued to rely upon Dang as the architect of the Caldera model because Dang built and continued to update Caldera's model for valuing a transaction with Company A.

b. Dang provided comments to Cernich, Tseng, and Siddiqui on Caldera's bid letters for Company A which were in competition with Apollo/Athene's own bid materials, and Cernich and Tseng had ongoing communications with Dang to receive his thoughts about how to strengthen Caldera's bid relative to Apollo/Athene's bid. They then incorporated Dang's feedback into Caldera's bid materials.

c. On April 22, 2018, Dang surreptitiously accessed Apollo's electronic folders relating to Company A. Dang wrongfully transmitted the documents in these folders outside Apollo through one of his personal email addresses. Upon information and belief, Dang transmitted these documents to Siddiqui, Cernich, and Tseng.

d. Dang provided feedback to Siddiqui, Cernich, and Tseng regarding why Caldera was purportedly a better buyer for Company A than Apollo and Athene. Cernich incorporated Dang's feedback into the revised bid letter.

e. Siddiqui asked Dang, Cernich, and Tseng to opine on whether Caldera should directly tell Company A's financial advisor that Apollo supposedly had taken a particular action with respect to Company A. Cernich stated that this might be helpful information to pass along to Company A at some point but he recommended that they wait to do so, because raising that issue could result in more competition for Caldera from Apollo and Athene, which Cernich did not want to happen. Dang agreed with this assessment.

65. All the while, Dang repeatedly reminded Cernich, Tseng, and Siddiqui of the ongoing need to hide his conduct from Apollo (which they continued to do), and Dang continued to act with the substantial assistance of Cernich and Tseng to subvert Apollo's interests.

66. On May 1, 2018, Dang suggested to the Caldera team that there was no "downside in some subterfuge" with respect to Apollo. He was referring to misleading Apollo and Athene by providing misinformation in the market in connection with Caldera's bid for Company A which he believed might impact Apollo's and Athene's thinking. The others appeared to agree with this assessment.

67.    As a result of their misconduct, Cernich and Tseng should be liable jointly and severally for compensatory damages to Apollo, including all sums of money paid by Apollo to Dang (that have not yet been returned) and Siddiqui during the time period of their disloyalty and additional costs incurred by Apollo (such as costs and fees incurred by Apollo in responding to the underlying misconduct that Cernich and Tseng aided and abetted).  In addition, Cernich and Tseng should be held liable for punitive damages.  Apollo also seeks injunctive relief as to Cernich and Tseng, including the issuance of an order enjoining them from using or disclosing Apollo's Confidential Information that they obtained from Siddiqui and/or Dang, and an order to destroy all of Apollo's Confidential Information that is in their possession, custody, or control.  Apollo seeks any further relief from the Court that is just and necessary in light of Cernich's and Tseng's extensive misconduct.

### FIRST CLAIM

**(Against Cernich, For Aiding and Abetting Dang's Breach of Fiduciary Duty)**

68.    Apollo restates and incorporates the allegations set forth in the foregoing paragraphs as though fully stated herein.

69.    While an Apollo employee, Dang was bound to exercise the utmost faith and loyalty in performance of his duties.  As the JAMS Arbitrator concluded and as set forth above, Dang breached his duty of loyalty to Apollo by acting in a manner inconsistent with his agency and relationship of trust with Apollo.

70.    The JAMS Arbitrator held that Dang breached the fiduciary duties he owed to Apollo in numerous ways between July 27, 2016 and October 26, 2018.  He breached his duties by, among other things, spending a material amount of his work hours on Caldera-related issues, including on Caldera's model, and he increased the time he focused on Caldera into 2017 and 2018.  Moreover, Dang actively worked on materials used to solicit Apollo and Athene investors

23

to invest in Caldera to the detriment of Apollo and Athene, and he helped prepare Caldera's bids to acquire targets that he knew were Apollo and Athene acquisition targets.  Dang also used his inside access and resources at Apollo to siphon information to his Caldera counterparts, including, most notably, in spring 2018, when he surreptitiously accessed Apollo's Company A folders and wrongfully transmitted the documents in these folders outside Apollo through one of his personal email addresses.  In sum, Dang's actions during this time were continuous, unauthorized, and adverse to Apollo.

71.     As the former Senior Vice President and Chief Actuary of Athene, who himself had a duty of loyalty to his employer, Cernich knew that Dang, an Apollo employee and principal, owed a fiduciary duty of loyalty to Apollo.

72.     Nevertheless, Cernich substantially assisted Dang in breaching the fiduciary duties that he owed to Apollo and actively concealed Dang's role in Caldera.  Cernich consistently solicited Dang's services for work on Caldera-related matters, including tasking Dang with having the pen on the model that Caldera would use to market itself to investors and potential acquisition targets, including at Apollo's expense, and then engaging Dang in further discussions about the model and how to revise it. Cernich further substantially assisted Dang in his breaches by consistently working to keep his involvement in Caldera hidden from those outside the Caldera team.  Cernich was careful to keep Dang off of email chains that could potentially be forwarded to Caldera's advisors and other third parties, and Cernich scrubbed references to Dang from external-facing work product.  Cernich also dialed Dang into conference calls so that Dang's participation would go unnoticed, and Cernich refrained from forwarding meeting invites to Dang to avoid notifying the meeting organizer, who would receive an alert that the meeting invite had been forwarded to a specific recipient.  Cernich also worked to ensure that the metadata was

stripped from any document that was sent to third parties so that Dang's name would not appear anywhere in the underlying metadata.  As a direct result of Cernich's substantial assistance in actively concealing Dang's involvement in Caldera, Dang was able to remain an Apollo employee for over two years, while actively working for a competitor and subverting Apollo's interests.

73.     During this time of disloyalty, Apollo continued to pay compensation to Dang that it would not have paid had it not been deceived, and as a result, Apollo has been damaged.  During Dang's time of disloyalty from July 2016 through October 2018, Apollo paid Dang approximately $2.03 million (in salary, bonus, and carry).  Cernich should be held jointly and severally liable for this amount that has not yet been returned to Apollo for his role in substantially assisting Dang's breach of his fiduciary duty of loyalty.

74.     Apollo has been damaged further because Cernich is now in possession of at least dozens of documents containing Apollo's Confidential Information.  Cernich should be enjoined from using any Apollo Confidential Information and should be ordered to destroy all of these documents within his possession, custody, or control, under the supervision of a court-appointed forensic examiner.

## SECOND CLAIM

### (Against Tseng, For Aiding and Abetting Dang's Breach of Fiduciary Duty)

75.     Apollo restates and incorporates the allegations set forth in the foregoing paragraphs as though fully stated herein.

76.     While an Apollo employee, Dang was bound to exercise the utmost faith and loyalty in performance of his duties.  As the JAMS Arbitrator concluded and as set forth more fully above, Dang breached his duty of loyalty to Apollo by acting in a manner inconsistent with his agency and relationship of trust with Apollo.

77.     The JAMS Arbitrator held that Dang breached the fiduciary duties he owed to Apollo in numerous ways between July 27, 2016 and October 26, 2018.  He breached his duties by, among other things, spending a material amount of his work hours on Caldera-related issues, including on Caldera's model, and he increased the time he focused on Caldera into 2017 and 2018.  Moreover, Dang actively worked on materials used to solicit Apollo and Athene investors to invest in Caldera to the detriment of Apollo and Athene, and he helped prepare Caldera's bids to acquire targets that he knew were Apollo and Athene acquisition targets.  Dang also used his inside access and resources at Apollo to siphon information to his Caldera counterparts, including, most notably, in spring 2018, when he surreptitiously accessed Apollo's Company A folders and wrongfully transmitted the documents in these folders outside Apollo through one of his personal email addresses.  In sum, Dang's actions during this time were continuous, unauthorized, and adverse to Apollo.

78.     As the former Vice President of Reinsurance at Athene who himself had a duty of loyalty to his employer, Tseng knew that Dang, an Apollo employee and principal, owed a fiduciary duty of loyalty to Apollo.

79.     Nevertheless, from the time that Tseng joined the Caldera team in fall 2017, Tseng substantially assisted Dang in breaching the fiduciary duties that he owed to Apollo and actively concealed Dang's role in Caldera.  For example, Tseng regularly engaged Dang in Caldera-related discussions and exchanged comments on Dang-created work product being used by Caldera to solicit investment or to pitch to acquisition targets.  Tseng further substantially assisted Dang in his breaches by consistently working to keep his involvement in Caldera hidden from the outside world.  To this end, Tseng worked carefully to keep Dang off of email chains that could potentially be forwarded to Caldera's advisors and other third parties, and even reminded his Caldera

counterparts not to forward certain emails where Dang's name appeared earlier in the chain. Moreover, Tseng dialed Dang into conference calls so that he would not be identified as a participant. Further, Tseng communicated with Dang through his "Imran persona," that is, by sending and copying emails to the Siddiqui Gmail address to which Dang had access rather than sending emails directly to Dang at his personal email address. Tseng also coordinated with Dang to make sure that the metadata was stripped from any document that was sent to third parties so that Dang's name would not appear anywhere in the underlying document. As a direct result of Tseng's substantial assistance in actively concealing Dang's involvement in Caldera, Dang was able to remain an Apollo employee until October 26, 2018 while actively working for a competitor and subverting Apollo's interests.

80. During this time of disloyalty, Apollo continued to pay compensation to Dang, and as a result, Apollo has been damaged. During Dang's time of disloyalty from July 2016 through October 2018, Apollo paid Dang approximately $2.03 million (in salary, bonus, and carry). This includes approximately $655,810, remitted from October 2017 (when Tseng joined Caldera) to October 2018 (when Dang left Apollo). Tseng should be held jointly and severally liable (with Cernich) for his and Cernich's role in substantially assisting Dang's breach of his fiduciary duty of loyalty during the October 2017 to October 2018 period.

81. Apollo has been damaged further because Tseng is now in possession of documents containing Apollo's Confidential Information. Tseng should be enjoined from using any Apollo Confidential Information and should be ordered to destroy all of these documents within his possession, custody, or control, under the supervision of a court-appointed forensic examiner.

## THIRD CLAIM

### (Against Cernich and Tseng, For Aiding and Abetting Dang's Fraud)

82.     Apollo restates and incorporates the allegations set forth in the foregoing paragraphs as though fully stated herein.

83.     Over the course of his employment, Dang engaged in an ongoing course of fraudulent conduct, concealed his conduct from Apollo, and made repeated material misrepresentations to Apollo concerning his loyalty.  For example, on October 31, 2016, Dang signed a false certification that he had, and would continue to, comply with Apollo's Code of Ethics, and that he had not engaged in any outside business activities.  He made the same certification on November 8, 2017.  At the time he made these certifications, he knew that they were false, because he had performed extensive and time-consuming work for Caldera, which included work to further Caldera's interest at the expense of Apollo's.  Dang made these false representations in order to deceive Apollo into continuing to pay him as though he were a loyal employee.  As an entity that required annual certifications from its employees, including Dang, Apollo reasonably relied on Dang's truthfulness.  As a result of this fraudulent certification and his ongoing pattern of fraudulent conduct, Apollo continued to pay Dang through October 26, 2018, and was damaged by virtue of its continued payments to him.  The JAMS Arbitrator held that Dang committed a fraud against Apollo.

84.     Cernich spent most, if not all, of his career in the insurance industry, which is heavily regulated. As a highly experienced executive in a heavily regulated industry, he would have known that Dang was required to submit certifications about his business activities to Apollo. In addition, Cernich, as a former executive of Athene, and Tseng, as a former vice president of Athene, were aware of the annual certifications that Apollo employees, including Dang, were required to sign.  Upon information and belief, they knew that Dang was not in compliance with

Apollo's Code of Ethics, which requires Apollo employees to disclose any outside business activities, and that Dang did not inform Apollo of his role in Caldera, based on the fact that Dang himself took repeated steps to hide his involvement in Caldera from Apollo.

85.     Cernich and Tseng substantially assisted Dang's fraud, including by helping to conceal Dang's role in Caldera from Apollo and other third parties who they believed would inform Apollo of Dang's role at Caldera.  Specifically, among other things, Cernich and Tseng (i) took steps to ensure that Dang's name did not show up in the metadata for documents that were circulated externally; (ii) intentionally kept Dang off of emails to third parties; (iii) conferenced Dang into phone calls so he did not have to announce himself on calls; and (iv) engaged in the wide variety of other deceptive conduct described above.  In doing so, Cernich and Tseng kept Apollo from learning that Dang's certifications to Apollo were false as he was working for a competitor and working to subvert Apollo's interests while continuing to collect an Apollo paycheck.

86.     But for Cernich's and Tseng's assistance in concealing his involvement, Dang would not have defrauded Apollo in the way that he did for the amount of time that he did. Moreover, as a direct and proximate result of Cernich's and Tseng's assistance, Apollo suffered damages, as it employed and paid Dang for over two years while he was actively working to undermine its interests, which Apollo would not have done had it known that Dang's representations to Apollo were false.

87.     As a result of Dang's fraud and the substantial assistance that Cernich and Tseng provided, Apollo paid Dang approximately $2.03 million (in salary, bonus, and carry), which it otherwise would not have paid him.  Cernich and Tseng should be held jointly and severally liable

for the amount paid to Dang that has not yet been returned (with Tseng's liability prorated for the time of his involvement) for their role in substantially assisting Dang's fraudulent conduct.

88.     Apollo further seeks punitive damages against Cernich and Tseng for the brazen and malicious acts that they took against Apollo in allowing Dang to commit this fraud and capitalizing on Dang's position within Apollo.

### FOURTH CLAIM

**(Against Cernich, For Aiding and Abetting Siddiqui's Breach of Fiduciary Duty)**

89.     Apollo restates and incorporates all of the allegations set forth in the foregoing paragraphs as though fully stated herein.

90.     While an Apollo employee, Siddiqui was bound to exercise the utmost good faith and loyalty in the performance of his duties.  As the JAMS Arbitrator concluded and as set forth above, Siddiqui breached his fiduciary duty of loyalty to Apollo by acting in a manner inconsistent with his agency and relationship of trust with Apollo.

91.     The JAMS Arbitrator held that Siddiqui violated the fiduciary duty that he owed to Apollo by, among other things, transmitting internal Apollo reports, decks, and analyses from his personal email account to the personal email accounts of Cernich, Dang, and another individual involved with Caldera at the time.  Siddiqui further breached his fiduciary duty of loyalty owed to Apollo by working at cross-purposes with his employer, including by working for Caldera as it competed with Apollo and Athene for investors and acquisition targets.  For example, in spring 2017, Siddiqui was working on Apollo's bid to acquire FGL while he simultaneously was trying to steer investors to invest in Caldera so that Caldera could acquire FGL.  Siddqui also actively participated in efforts to advance Caldera's interests at the expense of Apollo and Athene.

92.     Cernich, as the former Senior Vice President and Chief Actuary of Athene who understood the importance of fiduciary duties, understood that Siddiqui, an Apollo employee and

limited partner, owed a fiduciary duty of loyalty to Apollo.  Cernich knew that Siddiqui was an Apollo employee and yet Cernich viewed Siddiqui's involvement in Caldera as critical to its development and success.

93.     Cernich substantially assisted Siddiqui's breaching his fiduciary duty of loyalty to Apollo and actively concealed Siddiqui's breach.  Cernich regularly engaged Siddiqui in discussions about their work on Caldera, including, at times, about Apollo's confidential information, which Siddiqui accessed as an Apollo employee and impermissibly sent to Cernich. Despite knowing of Siddiqui's improper acts, Cernich still expressed to Siddiqui that it was important that he be involved in Caldera, even while Siddiqui was an Apollo employee.  Cernich regularly engaged Siddiqui in Caldera's plans to divert business from Apollo, including by asking him to comment on work product and investor solicitation materials.  In the face of Siddiqui's ongoing breach, Cernich enabled Siddiqui to cover up his wrongdoing and keep Apollo unaware of Siddiqui's disloyalty by actively concealing Siddiqui's role in Caldera.  For instance, Cernich communicated with Siddiqui only by using Siddiqui's his personal email address.  Cernich solicited feedback from Siddiqui on emails and presentations to investors and third parties, but then intentionally omitted him from the outgoing emails to third parties and sent them to him after the fact.  Cernich also printed documents to PDF before sending them to outside investors in order to make sure that Siddiqui's involvement in Caldera was not apparent from the documents themselves.

94.     Apollo has suffered damages as a direct and proximate result of Cernich's aiding and abetting Siddiqui's breach of his fiduciary duty of loyalty.  For example, Apollo continued to pay Siddiqui's salary from July 2016 through June 2017 during Siddiqui's period of disloyalty because Cernich's efforts to actively conceal Siddiqui's misconduct were successful.  During

Siddiqui's time of disloyalty from July 2016 through June 2017, Apollo paid Siddiqui approximately $11.3 million (in salary, bonus, and stock), at minimum.  Cernich should be held liable for this amount.  Punitive damages should further be assessed against Cernich as a result of his conduct contributing toward Siddiqui's breach of his fiduciary duty.

95.     Apollo has been damaged further because Cernich is now in possession of at least dozens of documents containing Apollo's Confidential Information.  Cernich should be enjoined from using any Apollo information and should be ordered to destroy all of these documents within his possession, custody, or control, under the supervision of a court-appointed forensic examiner.

## FIFTH CLAIM

### (Against Cernich, For Aiding and Abetting Siddiqui's Fraud)

96.     Apollo restates and incorporates the allegations set forth in the foregoing paragraphs as though fully stated herein.

97.     Over the course of his employment, Siddiqui made repeated material misrepresentations to Apollo concerning his loyalty.  For example, on November 7, 2016, Siddiqui signed a false certification stating that he had, and would continue to, comply with Apollo's Code of Ethics, including with its prohibition against engaging in any outside business activities.  At the time he made this certification, Siddiqui knew that it was false, because he had performed extensive and time-consuming work for Caldera, which included work to further Caldera's interests at the expense of Apollo's interests.  Siddiqui made these false representations in order to deceive Apollo into continuing to pay him as though he were a loyal employee.  As an entity that required annual certifications from its employees, including Siddiqui, Apollo reasonably relied on Siddiqui's truthfulness.

98.     After submitting his certification in 2016, Siddiqui never corrected his certification nor informed Apollo of his unauthorized outside business activities.  As a result, Apollo continued

to pay Siddiqui through the effective date of his resignation, and was damaged by virtue of its continued payments to him.

99.    Cernich spent most, if not all, of his career in the insurance industry, which is heavily regulated. As a highly experienced executive in a heavily regulated industry, he would have known that Siddiqui was required to submit certifications about his business activities to Apollo.   In addition, Cernich, as a former executive of Athene, was aware of the annual certifications that Apollo employees, including Siddiqui, were required to sign.  Upon information and belief, Cernich knew that Siddiqui was not in compliance with Apollo's Code of Ethics, which requires Apollo employees to disclose any outside business activities, and that Siddiqui did not inform Apollo of his role in Caldera, based on the fact that Siddiqui himself took repeated steps to hide his involvement in Caldera from Apollo.

100.    Cernich substantially assisted Siddiqui's fraud by helping to conceal Siddiqui's role in Caldera from Apollo.  For example, Cernich worked with others involved with Caldera to ensure that Siddiqui's name did not show up in the metadata for documents that were circulated externally and intentionally kept Siddiqui off of emails to third parties.  In doing so, Cernich kept Apollo from learning, among other things, that Siddiqui was providing Apollo's Confidential Information to a competitor, actively trying to divert investment opportunities from Apollo to Caldera, and attempting to usurp Apollo's corporate opportunities, including FGL and Company A.

101.    But for Cernich's assistance in concealing his involvement, Siddiqui could not have defrauded Apollo in the way that he did for the amount of time that he did.  As a direct and proximate result of Cernich's assistance, Apollo suffered damages, including because it continued to employ and pay Siddiqui, which it would not have done had it known that Siddiqui's representations were false.

102.     As a result of Siddiqui's fraud and the substantial assistance that Cernich provided, Apollo paid Siddiqui at least $11.3 million, which it otherwise would not have paid him.  Cernich should be liable for this amount.

103.     Moreover, Apollo seeks punitive damages against Cernich for the brazen and malicious acts that he took against Apollo in substantially assisting Siddiqui with perpetrating his fraud.  Cernich sought to capitalize on Siddiqui's position within Apollo, which is why it was so important to them that he and others at Caldera keep Siddiqui's initial involvement in Caldera a secret from the outside world, including Apollo.

<u>**SIXTH CLAIM**</u>

**(Against Cernich, For Tortious Interference with Contract)**

104.     Apollo restates and incorporates the allegations set forth in the foregoing paragraphs as though fully stated herein.

105.     Apollo had several valid contracts with Siddiqui during his time at Apollo, including the November 24, 2014 Amended and Restated Limited Partnership Agreement of Apollo Advisors VIII, L.P. (the "LPA"), the September 30, 2008 Restricted Share Unit Award Agreement under the Apollo Global Management, LLC 2007 Omnibus Equity Incentive Plan and several other similar unit award agreements (the "Unit Award Agreements"), and an employment agreement.  The LPA, the Unit Award Agreements, and the employment agreement included restrictive covenants that were in effect during Siddiqui's tenure at Apollo and remained in effect after his departure.

106.     Cernich knew of Siddiqui's contractual agreements with Apollo and that these agreements prohibited Siddiqui from working for Caldera or any other competing business and from soliciting Apollo investors or employees, among other prohibitions.   Indeed, when Siddiqui began working on Caldera matters as an Apollo employee, Cernich spoke to Siddiqui about leaving

Apollo to work for Caldera officially, and Siddiqui replied that he needed to stay longer to ensure that he received a large payout from Apollo that was soon due to him.

107.     Notwithstanding his knowledge of Siddiqui's contracts with Apollo, Cernich intentionally procured Siddiqui's breach of the LPA, the Unit Award Agreements, and his employment agreement by soliciting him to work for Caldera.  Even when Siddiqui told Cernich that he needed to remain employed by Apollo to receive his payout, Cernich continued to solicit Siddiqui's assistance on Caldera projects.  Cernich took numerous steps to involve Siddiqui in Caldera-related projects and initiatives during this time, including by soliciting his feedback on Caldera work product that ultimately was used to solicit investors or to bid on target companies, including FGL, which Apollo and Athene were targeting at the same time as Caldera.  Cernich, who benefited from Siddiqui's assistance, also took various steps to hide Siddiqui's involvement in Caldera from outsiders in order to conceal the breaches that he had procured.  For example, he removed traces of Siddiqui's name in Caldera work product that was shared with investors, including by deleting references to Siddiqui and removing the metadata.  He also made consistent efforts to leave Siddiqui off of emails with third parties to avoid exposing Siddiqui's involvement.

108.     As a result of Cernich's intentionally procuring Siddiqui's breach of the LPA, the Unit Award Agreement, and his employment agreement, Apollo was damaged in the form of continuing to employ and pay Siddiqui in an amount of at least $11.3 million.  Cernich should be held liable for this amount.

## PRAYER FOR RELIEF

109.     Based on the foregoing, Apollo respectfully requests:

   a.   The issuance of an injunction enjoining Cernich and Tseng from using or disclosing Apollo's Confidential Information that they obtained from Siddiqui or Dang, and

requiring them to destroy Apollo's Confidential Information that is in their possession, custody, or control;

b. An award of damages in an amount adequate to compensate Apollo for the damage it incurred as a result of Cernich's and Tseng's wrongful actions, including but not limited to an award sufficient to compensate Apollo for (i) the compensation it paid to Dang during the period of his disloyalty that has not yet been returned, including his salary and benefits, totaling approximately $1.03 million; (ii) the compensation it paid to Siddiqui during the period of his disloyalty, including his salary and other benefits totaling approximately $11.3 million; (iii) fees incurred by Apollo in responding to and prosecuting the underlying misconduct of Siddiqui and Dang that Cernich and Tseng aided and abetted; (iv) fees incurred by Apollo in connection with its bid for FGL while Siddiqui and Dang were secretly advancing the interests of Caldera; and (v) other compensatory damages in an amount to be determined at trial;

c. An award of punitive damages in an amount to be determined at trial; and

d. Any other relief the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial before a jury on all of their claims.

New York, New York                     MINTZ LEVIN COHN FERRIS
January 31, 2020                       GLOVSKY AND POPEO PC


 /s/ Robert I.  Bodian

Robert I. Bodian  (RIBodian@mintz.com)
Scott A. Rader  (SARader@mintz.com)
John P. Sefick (JPSefick@mintz.com)
Amanda B. Asaro (ABAsaro@mintz.com)
Chrysler Center
666 Third Ave.
New York, NY 10017
Tel:  (212) 935-3000

*Attorneys for Plaintiffs Apollo Global
Management, Inc., Apollo Management,
L.P., Apollo Advisors VIII, L.P., and Apollo
Advisors IX, L.P.*